Our third case this morning is No. 23-1093, Vandewater International Inc. v. United States. Okay, Mr. Curran? Hold on just one second, please. May it please the Court, I'm Christopher Curran for Sigma. I will be limiting my argument to the K-0 issue. Your Honors will recall that the K-0 issue raises the question of the plain meaning of the Mr. Curran, before we get into this, what's the current status of the different cases? Where are we? Of the different cases? Yes. Are you referring to We're an intervener in this case, right? Yeah, we are an intervener in this case. Vandewater has abandoned its position in this case as a result of this case. It declared bankruptcy and has not proceeded. But we intervened in the CIT and have filed our notice of appeal here, and we've participated in the proceedings. Your case is pending at the CIT? It stayed at the CIT. So rather than formally consolidating the three cases, the CIT, I guess out of a concern about proprietary information being shared, related the cases. And Your Honor may have observed that, for example, the K-0 ruling by the CIT bears the caption of all three cases. Right. And describes them as related. So today's decision will affect the other stayed decisions? Yes, in fact. Are there any other issues that are raised in those cases that are stayed that are not before us today? We think not. We think that this appeal will How about the suspension and liquidation issue? Well, that doesn't apply to SGMA. That issue is only for SCI, a different intervener appellant. So that does not concern SGMA or any of the arguments I will be making today. Okay. All right. Thank you. From our perspective, Your Honor. That issue is really not in this case, right? Well, I leave that to SCI. It's not in SGMA's bailiwick. I'll say that for sure. Okay. Go ahead. I read SCI's brief as advancing that argument on its own behalf. But in this proceeding, there were no entries that raised that question. For SGMA, no. Correct. Okay. All right. Go ahead. So from SGMA's perspective, this case is about the plain meaning of the anti-dumping duty order. And this Court will recall the ArcelorMittal case. We think that this appeal raises a straightforward application of that case. Okay. But let me give you a little bit different perspective and ask you to comment on it. Sure. It seems to me that both sides are arguing about things that Congress hasn't addressed. And you rely on the plain meaning, the industry practice. Perhaps, to some extent, you rely on the petition, which itself relied on the industry standard. But as I read the Commerce decision here, page 140 of the original decision and page 69 of the remand decision, the Commerce just basically brushed aside the industry practice and failed to consider it. And there wasn't any decision by Commerce either as to the meaning of the industry standard or, indeed, the significance of these supposed anomalies advertising by parties that the government relies on. So why shouldn't we send this back to Commerce to have them address the issues rather than our doing it de novo? I mean, they have the expertise. It's not our job in the first instance to be interpreting these orders and determining what the industry practice is. Well, these industry practice and industry jargon and industry terminology issues were raised below. No, I understand that. But you and the government seem both to be asking us to construe the order based on our determination of what the industry practice is. And what I'm suggesting to you is that it's really that's not our job. Our job is to ask Commerce to address the relevant factors. And there's a relevant factor here, in your view, that hasn't been addressed by Commerce. That is the industry practice. Yeah. I read ArcelorMittal to be addressing that issue, right? It concludes that the issue is de novo in this court. And there, this court's ruling did not result in a remand. It resulted in an analysis and a ruling that the products were not covered by the anti-dumping duty order based on its plain meaning. So I see no reason why this panel shouldn't follow that same precedent and resolve the issue based on the plain meaning interpreted in light of the industry standards. Let me ask precisely your argument. I thought one of your arguments was that Commerce erred by not taking an independent, stand-alone review of the duty order and instead went on to rely on the K1 materials. And that your argument is that it should have, the first error is that it should have had a stand-alone independent analysis. That's true. It should have done the independent analysis, and then it should have concluded that That's an argument. Correct? That's right. That's right. Yeah, I mean, we read the How can that be if the regulations at that time permitted Commerce, in fact almost mandated Commerce, in the scope ruling to address not only the text of the duty order, but also the K1 materials? It uses the word will. Well, I think that the judicial gloss on the regulation is that there should be an independent K0 analysis that precedes any K1 analysis. And we think that Commerce gave short shrift to K0 here. And that's why we're here, because Commerce proceeded. They blew past the K0 and went to K1 and then ultimately at the CITs. I thought maybe they started at the top and said these are butt-roll pipes and went, you know, section by section of the duty order and addressed them and said, now that we've achieved that, let's go to the K1 materials, which they probably were required to do. Well, we certainly read it differently, right? We read that the K0, whatever Commerce did as to K0, didn't take into account the industry standards. They refused to consider the industry. That's the way I view the Commerce decisions, is saying industry standards are not relevant. We're not going to consider them. Now, if that's wrong, it doesn't seem to me that it's our job to determine, to read the industry standards and determine what they are, because there are fact issues involved in that, including the government's argument that there is inconsistent practice, which suggests that the industry standard and ASME standard is not exclusive. So I gather you don't want a remand. I don't want a remand. I'd like this Court to do what it did in Marcelo Mazzoli. I mean, I just don't understand that that's our job, to make factual determinations about reading industry standards and determining whether the actual practice on which the government relies on is consistent with the industry standards. We don't consider this to raise factual issues. This is a pure question of law, and that's what this Court's precedents say. It says that the K0 analysis is a pure question of law. That's why it's the normal review. The question of whether certain merchandise meets an industry standard, that's a factual issue. That is, but you don't get to that until first there's a factual question. You have a legal question that you've presented to us, but even if you were to prove error there, we wouldn't be able to answer the factual question. Commerce has already done that. I think if you answered the first question, the K0 question, there wouldn't be a dispute. There wouldn't be a factual issue because it would be apparent under the properly interpreted plain meaning of the order that these welded outlets or branch outlets don't fall within the order. I have trouble. I've read the ASME standard, and there's support there for what you're saying, but it's not 100% clear to me what the industry standard is, and the government says, here are five examples that are not consistent with the industry standard. Why does that not raise a fact issue as to what the industry standard is? Because applying ArcelorMittal, the industry standards, you look at the industry standards. You can put pens down. That's the industry speaking. You could have an industry standard that's clear, which may have been the case in that case. Well, I think it's clear here as well. Well, under the standards, it's clear that butt-weld fittings are end-to-end fittings that join two segments of pipe. Because of the figures? Well, the figures, yes, and the expert opinions. Other than the figures, what's the language in the ASME standard? It says the butt-weld fittings are shown in the figures, but that's not 100% clear. But there's nothing like the products here. Wait, wait, wait. Sorry for the interruption. That's not the same thing as saying the industry standard is limited. I mean, there's, to me, somewhat of an ambiguity there. The branch outlets at issue in this case do not apply end-to-end at all. As the term outlet suggests, it is on the side or wall of the run pipe. And as to Vanderwater and as to SGMA and as to SCI, that part is welded, not with a butt-weld, but instead with a fish-mouth application to adjust to the contour of the run pipe. And at the other end, there's no butt-weld there. As to all of the plaintiffs in this case, it's either threaded or grooved. No butt-weld. So how can there be a branch outlet that falls within the butt-weld fitting duty order when there's no butt-weld at all associated with these branch outlets? That is not a factual issue. That is not a leap or a challenge for this court to conclude based on the standards, based on the expert testimony here. I see from your reaction, you're not buying this. But I don't see a distinction between what we're asking the court to do here and what this court did in ArcelorMittal. For us, it's a straightforward application. The butt-weld fitting anti-dumping duty order cannot apply to products that have no butt-weld. What about the ASME standard that you say excludes these fittings? Well, I think it's apparent throughout, and it's recited in the SPERCO. I'll refer you to the SPERCO declarations. No, forget about the SPERCO declarations for the moment. Show me where the ASME standard itself, the language is so clear. Okay. And so I won't refer you to the expert reports of SPERCO. The Joint Appendix has experts. Well, that's the line, expert reports, we're getting into factual issues. Well, I don't know about that. Is the expert credible, so on and so forth? You want us to do this, then I'll go, show me where the ASME standard is so clear that I should say that you're right. So the full standards, Your Honor indicated you've already looked at them, they're in the record, not in the Joint Appendix, right? They're in the record at 1264. I have the ASME standard. The version I have is 2003. I don't know whether that's the same one that existed in 1992 or not, but is that different from the one that's in the record? Well, the one that's in the record is 2013. One might wonder why a 2013 standard is relevant to a 1992 order. Well, the scope request was made when these were governing. It's the wrong standard. You're not interpreting the scope request, we're interpreting the order. So if it's an ASME standard, it ought to be the ASME standard that's in effect at the time of the actual order itself. Well, I think you will find that there's no material difference between what's in the current or in the 2013 as opposed to the earlier, and, in fact, I think there's a description of changes that have been made. So the argument that you're making now, that's already been argued and decided for law. Yes. Right. So you're arguing that you're attacking what's called KO, the legality of KO, that Congress made a legal error in not making it a dispositive finding on KO.  They found ambiguity when – I'm sorry. You keep saying that this is a de novo review issue. Yes. It's de novo only to the extent that we're now sitting in the shoes of the CIT looking at it, applying the same standard it would apply, and it would apply a substantial evidence standard to review. I don't agree with that. No, the CIT would also apply de novo. This is interesting because I want to get to the root of the disagreement because our precedent is – our long line of precedent has been that we review duty orders through the lenses of the CIT. Right? We stand in their shoes. It's de novo because it's de novo for them, but this particular question is a substantial evidence question. I don't think that's right, Your Honor. I think under Whirlpool and under Meridian – But what happens if we disagree with it? You lose? You lose your case? No, we have a tougher standard, and one reason why I'm focusing on case – I'm sorry. I didn't hear you. It's a different standard that would apply. Okay. So now you would say I don't believe there's substantial evidence. That's right. But that question's already been decided. When you start talking about the pipes coming together and the B, the well-being and everything, all that's factual in nature. I'm sorry. All that's been decided already. Well, it hasn't been decided, right? Because commerce never addressed the industry standard. They refused to. They refused to do it. There's no decision by commerce on this question. But if commerce fails to address something that's presented to them, and then it comes to this court on de novo review, there's nothing stopping this court from engaging in that legal analysis. Do you believe that commerce has not ruled on this particular issue, where the butt-well pipes, using the description you're giving, fall into the river? I believe they did a drive-by that does not constitute a true hero. A drive-by doesn't do anything. You want to straddle a line. You want the vehicle to go and burst out of the line. Did commerce rule on the argument you're making today that butt-well falls within the river? They necessarily did because they preceded the K-1 and K-2. I just wanted to clarify that. They didn't decide this because they didn't address the industry standard that you're relying on. They decided the ultimate question, but they said we're not going to look at the industry standard, right? That's right. I'm agreeing with both of you because if commerce proceeds to K-1 and K-2, they're necessarily passing on K-0. Did they look at the industry standards under K-1? They did not address them. I don't know if they referred to them or not. They're certainly referred to in the petition, but I don't believe that. How about under K-2? When the CIT remanded and said, I want you to apply K-2, did they look at industry standards there? I don't recall that they did. Well, I mean, this is your argument. I think that they did. I think you're presenting a question that has been gone over by the CIT and commerce, and there's been a decision. It's a factual issue. We have to apply a substantial evidence standard in this case. How can that be squared with Whirlpool and Meridian, which says that the question of whether there's ambiguity is a question of law that merits de novo review in this court? It can't be squared with those. It does say that it merits de novo review, but it also goes on and says that substantial deference is given to commerce in its review of the dumping orders, and that's basically what substantial evidence is. That's once commerce has gone past K-0 and is then addressing K-1 and K-2, that substantial evidence standard applies, but not for K-0. Okay. All right. We will give you two minutes for rebuttal. Thank you. Mr. Howley? May it please the Court, Judge Dyk, I'd like to address your question first, which was did commerce address the industry standards issue? I think part of the complicating factor here is this is really three scope rulings in the guise of a single case. So there are actually three commerce decisions that the Court would have to contend with. The first, Judge Dyk, is the one you mentioned starting on appendix page 140. That applies to Vandewater, which is not a party in this appeal. The second, and this is in footnote six of our brief, is the Sigma decision, and that's at 3724, 3725. And there I think the Court will find that commerce did address industry standards as it related to Sigma's arguments that it was making. But that's not this case. Well, Sigma's arguments, the ones they're raising about whether commerce addressed industry standards, commerce addressed it as it related to the arguments that Sigma was making. Because it was arguing about ASME 16.9 and ANSI standards, and commerce addressed it there because Sigma was raising those arguments. What page are you signing to where they addressed the arguments? 3724 and 3725 of the appendix. Which one, the second volume? It should be the second volume, correct. So if you start at the bottom of 3724 and then it loops into 3725. I don't, maybe I'm just reading this quickly, but I don't see that it's actually really addressing the AMSE standard. It seems to be saying that they're not relevant. It says this doesn't limit the scope language to include only solely merchandise produced or manufactured to the standards. That may be true, but the standards are certainly relevant to interpreting the scope order. And if commerce has, I mean, if commerce has refused to consider them as a relevant criterion, why isn't that error? Well, because you see commerce contending with the arguments that Sigma's making. It's saying that the ANSI. No, it's dismissing them. It's not engaging with them. It's not saying their view of the industry standard is not right. There are all these exceptions. It hasn't dealt with the basic question of whether the industry standard would exclude these fittings. And what I'm suggesting to you is I don't understand how commerce can render a decision on this without considering the relevant industry standards and at least saying they've been weighed by other things or they're not interpreting the standards correctly. I view this order that you're showing us to be the same as the order in the case before us. It says industry standard's not relevant. We're not going to consider them. I don't think it's – they're not saying it's not relevant. I think Sigma is saying that the ASME – it's the same argument they're making now. They're saying the ASME standard is dispositive on the question about the scope language. And what commerce is saying is, well, look, we're looking at it, and no, it's not. So in that respect, I do see commerce grappling. I don't understand that their argument, the argument of the parties about industry standards, was limiting to saying that only consider these if they're dispositive. I do think that's the primary thrust there. Let's assume that you're wrong about that, okay, and that they raised the industry standards. Is it not the case that commerce is saying, no, we're not going to consider the industry standards? I think – you disagree, Judge Steck, and that's fine, but I do think commerce is grappling with what they're presenting as their argument and saying it's not dispositive on the question. So we need to go beyond the scope of what you're claiming the ANSI says. Do you agree that the industry standards are relevant? They would be relevant under our solar middle, yes. Yeah. And that's finding precedent. So you can't dismiss them and just say we're not going to look at them. And, again, this is, I think, where we disagree. I don't think commerce is dismissing that argument. It's actually addressing it square on as Sigma had presented it. Let me see if I'm clear on this. So it seems to me that commerce did address industry standards in its KO analysis and that it said in view of that, in view of the text and the language and the physical description here, it's not dispositive, so it went on to K1. Correct. That's what happened. Yes, Your Honor. So, and, again, commerce is addressing that. Commerce never did say that industry standards don't matter or they don't have weight. It did not say that they're not important. It did not say we're not going to make any ruling on this. It says we've looked at everything. Correct. And it's not dispositive. So then it went on to? Then it went on to K1, the K1 contextual indicators. One thing I think is important is there are three scope rulings here. So just to be clear about this, do you agree that they never decided whether the industry standards excluded these fittings that are the subject of this case? I believe that commerce did. Made such a determination as to the meaning of the industry standards? Well, they had to go to K1, and they didn't ultimately. The question is, did commerce address the question of whether these fittings are within the industry standards? The steel branch outlets? Yes. It said that they would qualify as a pipe fitting under the industry standards, ultimately when it got to K2, because K1 didn't resolve the question. K0 didn't resolve the question. So commerce ultimately had to go all the way down the line to K2, using the channels of trade evidence to figure out how the end users were using the product. So at K2 you're saying they determined that these were outside the industry standard? That they would be included within the scope of the order. I think the industry standard part was inconclusive. I think this is what we're getting. The industry standard part was inconclusive. That's ultimately what commerce did. Okay. But where do they address the question of whether these fittings are within or without the industry standard? They never addressed that. Because the industry standards were sufficiently clear. Is that correct? They never addressed that? They addressed it. They didn't decide it because the industry standards weren't clear. And so they had to move on to K1. Look at Appendix 13. Yeah. Is this the discussion of industry standards you're referring to? Yes, Your Honor. And then this is where the trial court refers to commerce's decision, refers to the ANSI standards, the ASME, the MSS. It's grappling with all of it. And commerce addressed it in the first instance. Now, I would agree that in Vandewater, if we're talking about the Vandewater. There is no show me where Congress says we're looking at the industry standards and this material is not within the industry standard or that the industry standard is not clear. They never did that. Sometimes industry standards are. No, no, no. You're not answering my question. Where did they do that? It was inconclusive in this instance. They were grappling with it and they found it. Where did they address the question I'm talking about? 3724, 3725, as it relates to CIPA. And they say that the industry standards are not binding, right? They say it's not binding and it's not conclusive either way. So they go on to K1 and K2, which is precisely what commerce is supposed to do according to its regulations. If the scope language isn't clear on its face, if there's no singular meaning and industry standards don't clarify and elucidate giving those terms. Our cases have said you need to look at industry standards and consider that. We're not understanding how the commerce decision here is consistent with those cases. Okay. Well, respectfully, Your Honor, and I don't want to dwell on this point. I mean, Judge Dyke, if you disagree, 3724, 3725 would be the clearest explication of commerce addressing that issue as it relates to SGMA. And then there's another portion, another decision that relates to SCI where commerce addresses that as well. I think that's 4094 in the appendix. But again, part of the reason, Judge Dyke, why you're finding that the Vandewater decision doesn't address it quite as much as the SGMA decision or the SCI decision is because Vandewater didn't make these industry standard arguments. SGMA does. So when SGMA does, commerce addresses that argument head on and responds to it, you know, if they're making arguments under the standards. But in the Vandewater case, again, it's a different petitioner. It's a different party requesting a scope ruling. Commerce is addressing the case as Vandewater is raising it. So you're going to find three different decisions. And what I would urge the Court to do is review all three in the context of the KO decisions in this case. And I acknowledge that the procedural posture of this case is confusing because of the way that it involves three scope rulings. But I think because the KO decision applies to all three, that's how it has to be handled in this case, respectfully. It appears counsels for SCI are not here to press their K-1 argument. So if the Court doesn't have questions on K-0, I'll cede the rest of my time. Okay. Thank you. Mr. Curran. Your Honor, we believe that Vandewater did address the industry standards. And I refer you to Appendix 503, among other places, where that is addressed by Vandewater. So Vandewater raised the same industry standard arguments we're raising, and Commerce did not address them. So I understood Mr. O to be referring to a Commerce treatment of Sigma. That's not this case, as Your Honor has said a couple of times. So we have a situation where the issue was raised, Commerce neglected to address the K-0 issue, and now we're in front of this Court. Now, I want to refer back to Whirlpool. I know I'm beating maybe a dead horse here, but in Whirlpool, this Court stated, Commerce's inquiry on a scope ruling begins with the order's scope to determine whether it contains an ambiguity and thus is susceptible to interpretation. And here's the key sentence. The question of whether the ambiguous terms of a scope control the inquiry or whether some ambiguity exists is a question of law that we review de novo. So our point here is, this Court can do what Commerce failed to do. And that's what this Court did in ArcelorMittal. There's nothing stopping this Court from looking at the governing standards. And, Judge Streich, I, again, I insist that those standards do not raise factual questions. There's no way that's going to... If you lose on your legal issue that you raised about K-0, then we don't get to the other argument about the standards. Is that correct? We have to win. You need to re-open up the issue of whether the ruling on the K-0 ruling on the duty order was actually dispositive or not. Well, no. I mean, we still have K-1 issues we raise, and we incorporate SCI's brief to that extent. So we're not giving up. And Your Honor may recall the Fed Amit case where Your Honor dealt with some bricks and whether they felt... There, that was a K-1 case, and the Court concluded that there was not substantial evidence to show that those bricks in question were within the duty order. So we're not giving up on the K-1. At the end of the day, though, the review that we give to factual issues under K-0, that's subject to a substantial evidence. I don't think there are factual issues under K-0. I think that's a contradiction in terms. K-0 is a legal question. It's an ambiguity, yes or no. That's a legal question that Article III courts do all the time. This isn't that different from interpreting a statute. It may be a legal question, but it's got factual underpinnings. The way you answer that question is by looking at the facts. I don't agree that there's a factual question. Well, that's what happens in a review of a duty order. You're looking to see whether a particular product falls within the scope of an anti-dumping duty order, and the law teaches us that you start with this hierarchy. You first look at the text and the language of the duty order, and under the AREDS, you also look down at K-1. The CIT said, great, but you've got to do K-2 because I think that that wasn't enough of a review. So they put it back up. I don't see anything yet that shows me that these factual determinations, whether a particular pipe butts up against another and you have the bead or the weld, all of those are factual issues that are subject to substantial evidence. They may sound factual in nature, but, Your Honor, these branch outlets have nothing to do with the welds. What do you mean they may sound factual in nature? When you're holding your hands, illustrating pipes fitting each other, you're making a factual assertion. The factual assertion, if there is one, is this, that these branch outlets have nothing that can, in any universe, be considered butt-weld. They have no butt-weld aspect to them. What you're resisting is something you may lose on. We may decide that the application of industry standards for these fittings is a factual question, and does that mean that you lose? No, I'm sorry. Go ahead. That means we fight this out on remand, but we shouldn't have to because those standards and the accompanying diagrams that are incorporated in them make it obvious that there's no factual question here. And Mr. O pointed you to the part of the SGMA decision. Assuming we find this is a factual question, then that pretty much takes the wind out of your argument cells. Is that right? No. No, I don't think so. You may want us to go back and review those issues. That's what we'll do. It's like the case you saw, the veterans case you saw before us, where there's no finality on that particular case. You need for us to reopen an analysis of the KO in order for you to make these arguments that, in fact, have already been made and heard by commerce and the CIT. And not addressed. But they're addressed by commerce. So if you don't accept my invitation to roll up your sleeves and do the ambiguity analysis as a de novo review, then you should remand it to commerce and say, no, you've got to engage on the K0. How come you didn't engage in the ArcelorMittal analysis and looking at industry standards? That case says that these dumping orders have to be interpreted in light of industry practice and parlance. And here that wasn't done. The segment of the decision that Mr. O pointed to has commerce saying, we're not bound by these standards that they reference. How can they say that in light of ArcelorMittal? ArcelorMittal says, no, the orders have to be looked at in the industry standards. Because, as Judge Zeick, as you said, in the Mid-Continent case, there are due process issues here. The foreign exporters have to be on notice of what it is that's covered by the order. If they're not on notice and they're reading this in terms of industry standards and industry jargon, that has to be the lens through which the orders are looked at. And in a case like this, the due process consequences are astounding. I think you know from the briefs that these defendants, that the plaintiffs in this case who were the respondents below, have faced False Claims Act cases and have been found liable for tens of millions of dollars based on this order that talks about butt welds when these companies don't sell anything that's got a butt weld part of it. Okay, I think we're out of time. Thank you. Thank you, Your Honor. Mr. Kern, thank you, Mr. Hogg. The case is submitted.